UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

JOHN H.,[1]

                    Plaintiff,

     v.

COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
_____

DECISION & ORDER

20-CV-1278MWP

**PRELIMINARY STATEMENT**

      Plaintiff John H. ("plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Disability Income Benefits ("DIB"). Pursuant to the Standing Order of the United States District Court for the Western District of New York regarding Social Security cases dated June 29, 2018, this case has been reassigned to, and the parties have consented to the disposition of this case by, the undersigned. (Docket # 18).

      Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 15, 16). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with applicable legal standards.

---

[1] Pursuant to the November 18, 2020 Standing Order of the United States District Court for the Western District of New York regarding identification of non-governmental parties in social security opinions, the plaintiff in this matter will be identified and referenced solely by first name and last initial.

Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and plaintiff's motion for judgment on the pleadings is denied.

# DISCUSSION

## I. Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards. *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted). Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive"). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). In assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five steps are:

   (1)   whether the claimant is currently engaged in substantial gainful activity;

   (2)   if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

   (3)   if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations (the "Listings");

      (4)    if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity [("RFC")] to perform [his/her] past work; and

      (5)    if not, whether the claimant retains the [RFC] to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467. "The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

## II.    The ALJ's Decision

      In her decision, the ALJ followed the required five-step analysis for evaluating disability claims. Under step one of the process, the ALJ found that plaintiff had not engaged in substantial gainful activity since October 30, 2016, the alleged onset date.[2] (Tr. 20).[3] At step two, the ALJ concluded that plaintiff had the severe impairments of "cervical spine fracture status-post anterior cervical discectomy and fusion (ACDF), left shoulder dislocation status-post surgery, obesity, degenerative disc disease, sacroiliitis, May-Thurner syndrome with a history of deep vein thrombosis, polysubstance use with intermittent remission, major depressive disorder, anxiety disorder, and personality disorder." (*Id.*). At step three, the ALJ determined that

---

[2] During the administrative hearing, plaintiff requested to amend the alleged onset date to August 21, 2017. (Tr. 17). The ALJ determined that the record did not support a finding of disability from either the original or the amended onset date. (*Id.*).

[3] The administrative transcript (Docket # 14) shall be referred to as "Tr. ___," and references thereto utilize the internal Bates-stamped pagination assigned by the parties.

plaintiff did not have an impairment (or combination of impairments) that met or medically equaled one of the listed impairments in the Listings. (Tr. 20-22).

The ALJ concluded that plaintiff retained the RFC to perform light work but with certain limitations. (Tr. 22). Specifically, the ALJ found that plaintiff could sit for up to three hours and stand and walk for up to four hours during the workday and must be permitted an hourly five-minute break in order to stand, stretch, and change positions. (*Id.*). The ALJ further concluded that plaintiff could occasionally reach overhead, climb ladders and scaffolds, kneel, crouch, and crawl, frequently climb ramps and stairs, and continuously balance, stoop, and operate motor vehicles. (*Id.*). With respect to environmental limitations, the ALJ concluded that plaintiff could sustain frequent exposure to pulmonary irritants, occasional exposure to temperature extremes, and continuous exposure to moving mechanical parts and vibrations. (*Id.*). Regarding plaintiff's mental capacity, the ALJ concluded that he was able to perform work that was goal-oriented but not fast-paced, involving simple, routine tasks, simple work-related decisions, short and simple instructions, and only occasional changes in a routine setting and occasional interaction with others. (*Id.*).

At steps four and five, the ALJ found that plaintiff was unable to perform any past relevant work but, based on plaintiff's age, education, work experience, and RFC, that other jobs existed in significant numbers in the national economy that plaintiff could perform, such as cleaner/housekeeper, stock checker, and small products assembler. (Tr. 27-29). Accordingly, the ALJ found that plaintiff was not disabled. (*Id.*).

### III.     Plaintiff's Contentions

Plaintiff contends that the ALJ's determination that he is not disabled is not supported by substantial evidence and is the product of legal error. (Docket ## 15, 17). Plaintiff's sole challenge is that the ALJ failed to consider the effect that living in a halfway house had on his mental functioning in considering whether plaintiff met the requirements of Listing 12.04 and in formulating the RFC.[4]

"Listing 12.00(D)(1) describes the factors the ALJ must consider in any determination of mental functioning, including 'the kind and extent of supports [the claimant] receive[s], the characteristics of any structured setting in which [the claimant] spend[s] [his or her] time, and the effects of any treatment.'" *Withus v. Saul*, 2019 WL 6906972, *22 (S.D.N.Y. 2019) (citing 20 C.F.R. Pt. 404, Subpart P, App. 1, Listing 12.00(D)(1)), *report and recommendation adopted by*, 2021 WL 2012270 (S.D.N.Y. 2021). Specifically, Subsection 12.00(D)(1) instructs:

> Psychosocial supports, structured settings, and living arrangements, including assistance from [the claimant's] family or others, may help [the claimant] by reducing the demands made on [the claimant]. In addition, treatment [the claimant] receive[s] may reduce . . . symptoms and signs and possibly improve . . . functioning, or may have side effects that limit . . . functioning. Therefore, when we evaluate the effects of [the claimant's] mental disorder and rate the limitation of [the claimant's] areas of mental functioning, we will consider the kind and extent of supports [the claimant] receive[s], the characteristics of any structured setting in which [the claimant] spend[s] . . . time, and the effects of any treatment. This evidence may come from reports about [the claimant's] functioning from [the claimant] or third parties who are familiar with [the claimant], and other third-party statements or information.

---

[4] Plaintiff's challenge relates solely to his mental impairments; he does not challenge any portion of the ALJ's determination relating to his physical limitations. Therefore, the Court will limit its analysis and discussion of the relevant medical evidence to plaintiff's mental impairments.

20 C.F.R. Pt. 404, Subpart P, App. 1, §12.00(D)(1) (2018).

Plaintiff maintains that the ALJ's assessment of his mental functioning was flawed because the ALJ failed to consider the benefits of his supportive living environment – specifically, his time in a halfway house – in determining whether he met Listing 12.04 and in formulating his RFC.  I disagree.

Review of the record demonstrates that for much of the period considered by the ALJ the plaintiff lived alone and independently performed substantial activities of daily living, and his mental health impairments were well-controlled through medication.  Treatment notes from plaintiff's primary care physician in early 2017 reflect that he complained of anxiety, occasional depression, and difficulty sleeping.  (Tr. 335).  Plaintiff was prescribed Celexa, which improved his anxiety symptoms.  (Tr. 339).

In August 2017, plaintiff broke his neck in a swimming pool accident, necessitating surgery and prescription methadone for pain management.  (Tr. 354, 416, 424, 547, 572).  At about that time, he initiated mental health treatment at the Counseling Center upon referral by his addiction counselor at the Allegany Council on Alcoholism and Substance Abuse ("ACASA").  (Tr. 275).  Plaintiff reported feeling depressed and experiencing decreased motivation, which he believed impeded his addiction recovery.  (*Id.*).  At the time, plaintiff was living alone, was on probation following three DWI incidents, and managed a small "hobby farm" caring for dogs, chickens, ducks, and a parrot.  (Tr. 276, 289).  Plaintiff was diagnosed with major depressive disorder, severe, recurrent without psychosis, polysubstance dependence, and personality disorder, not otherwise specified.  (Tr. 290).  He was prescribed gabapentin and Remeron for mood instability and anxiety.  (Tr. 291).  The record suggests that plaintiff relapsed

on his addiction recovery in late 2017, resulting in his discharge from the ACASA substance abuse treatment program in January 2018. (Tr. 416, 985).

On April 25, 2018, consultative psychologist Christine Ransom, Ph.D., conducted a psychiatric evaluation of plaintiff. (Tr. 387-90). At the time, plaintiff reported that he lived alone, was on probation, and was being treated for depression and anxiety by his primary care physician. (*Id.*). Plaintiff reported that his prescribed medication managed his symptoms of depression and anxiety, which were in remission. (*Id.*). According to plaintiff, he was able to care for his personal grooming needs, prepare meals, clean, do laundry, and shop. (*Id.*). He also reported that he managed an animal farm and personally cared for chickens, ducks, pigs, and dogs. (*Id.*).

Plaintiff's mental status examination was essentially normal, and he demonstrated intact memory, attention and concentration. (*Id.*). Dr. Ransom diagnosed plaintiff with the mental impairments of substance dependence in remission and major depressive disorder and unspecified anxiety disorder, both in remission on medication. (*Id.*). She assessed that plaintiff did not have any functional mental health limitations. (*Id.*).

Although plaintiff reinitiated substance abuse treatment at ACASA in March 2018, his substance abuse continued and he was discharged from the program and referred to inpatient treatment at the Bradford MICA unit on June 3, 2018. (Tr. 984). While receiving inpatient care, plaintiff's prescriptions for gabapentin, Remeron and Celexa were continued, his prescription for methadone was discontinued, and he was prescribed Suboxone for maintenance therapy and Abilify and doxepin to assist with sleep. (Tr. 428). He was discharged from inpatient treatment on June 20, 2018, because he had achieved his treatment goals, and he moved into Weston Manor halfway house, a sober living facility. (Tr. 428-30, 436, 512).

Upon his discharge, plaintiff was mandated as a condition of his probation to attend addiction treatment at the Council on Addiction Recovery Services ("CARES"). (Tr. 902-22). At the time, plaintiff reported feeling happy most days and that it was "very easy" for him to perform household chores, clean, and care for his personal hygiene. (Tr. 911-13). Treatment notes demonstrate that plaintiff reported that he enjoyed his increased independence living at Weston Manor and that his prescribed psychotropic medications managed his depression and anxiety; he consistently reported stable and euthymic mood. (Tr. 925-48). During his residency at Weston Manor, plaintiff volunteered approximately twenty hours per week. (Tr. 512).

The record suggests that plaintiff moved out of Weston Manor on May 1, 2019. (Tr. 683). Approximately three weeks after relocating from the sober living facility, plaintiff was evaluated by consulting physician Rebecca Billings, Ph.D., who conducted a psychiatric examination of plaintiff. (Tr. 682-88). During the evaluation, plaintiff reported that he lived alone and attended weekly individual counseling sessions, triweekly group meetings, and monthly medication management appointments through his addiction recovery treatment at CARES. (*Id.*). Plaintiff reported some feelings of depression and anxiety after his relocation. (*Id.*). Plaintiff indicated that he independently performed his activities of daily living, including personal hygiene, cooking, cleaning, laundry, shopping, and landscaping. (*Id.*). Dr. Billings reported an essentially normal mental status examination of plaintiff with the exception of mildly impaired memory skills. (*Id.*). She opined that plaintiff might be mildly limited in his ability to understand, remember, and apply complex directions and instructions and moderately limited on occasion in his ability to regulate emotions, control behavior, and maintain well-being. (*Id.*).

9

After moving into his own residence, plaintiff continued substance abuse and mental health treatment at CARES throughout the remainder of 2019 and into 2020. (Tr. 72-96, 923-28; *see also* Tr. 72-96). During this time, plaintiff reported that his mental health symptoms were well-controlled by his prescription medication, and he repeatedly denied experiencing any depression, anxiety, or sleep disturbance. (*Id.*). Treatment notes reflect that he reported "doing great" and "keep[ing] busy," and he reported engaging in activities such as fishing, working out, and repairing a dock. (*Id.*).

Although the ALJ did not specifically address plaintiff's residence at the halfway house between the end of June 2018 through early May 2019, remand is not warranted on that basis. *See Pope v. Barnhart*, 57 F. App'x 897, 899 (2d Cir. 2003) ("[t]he ALJ must review all of the evidence relevant to a claim . . . , but he does not err by failing to explicitly mention all of that evidence") (internal quotation omitted); *Marnell v. Comm'r of Soc. Sec.*, 2018 WL 3620152, *13 (W.D.N.Y. 2018) ("the mere fact that an ALJ does not specifically mention certain evidence does not mean that such evidence was not considered"). As an initial matter, although the record contains some references to plaintiff's residence at the sober living facility, very little in the record exists to demonstrate or even suggest that plaintiff received any significant support directed at controlling or managing his psychiatric symptoms while residing there. Moreover, nothing in the record supports plaintiff's suggestion that his mental health symptoms diminished or were better controlled as a result of the support he received while living in the halfway house. Rather, with the exception of his substance abuse relapse, the record demonstrates that plaintiff's mental health symptoms remained relatively stable throughout the entire period and that his symptoms continued to be well-managed by medication after he returned to independent living. Further, Dr. Billings opined that plaintiff had some mild to moderate limitations, which were

accounted for by the ALJ in her RFC formulation. That opinion was rendered subsequent to plaintiff's departure from the halfway house and return to independent living.

Review of the ALJ's determination demonstrates that she specifically considered the supports that plaintiff received in assessing the four broad categories of mental functioning at step three and in formulating his RFC. The ALJ acknowledged plaintiff's testimony that his mother assists him with his daily tasks when evaluating his ability to adapt or manage himself. (Tr. 21-22). Further, the ALJ recognized that plaintiff received mental health and substance abuse treatment in August 2017, substance abuse treatment in March 2018 and June 2018, and that he was admitted for a seventeen-day inpatient treatment stay, during which he participated in individual and group therapy and received medication to address his mental impairments. (Tr. 24-25). The ALJ also acknowledged that plaintiff continued to receive medication management for his mental impairments throughout 2018 and 2019. (Tr. 25). I find that the ALJ adequately assessed the support provided to plaintiff and his living environment in assessing his mental functioning and that her determination is supported by substantial evidence. *See Stewart v. Saul*, 2021 WL 1176772, *10 (E.D. Tenn. 2021) ("[w]hile [p]laintiff claims the ALJ failed to consider the level of support she receives, the ALJ acknowledged that she received assistance from both family members and her case manager"); *Withus v. Saul*, 2019 WL 6906972 at *22 ("[t]he ALJ plainly considered the support [plaintiff] receives from her mother").[5]

To the extent plaintiff contends that the record demonstrates that he satisfies the requirements of Listing 12.04(C), or that the ALJ failed to sufficiently explain her determination

---

[5] Plaintiff's submission relies upon several decisions that ordered remand based upon the ALJ's failure to adequately consider plaintiff's ability to function outside of a structured setting. (Docket # 15-1 at 14-17). Many of these cases involve child disability applications, which are subject to different regulations. *See* 20 C.F.R. § 416.924a(b)(5).

that plaintiff did not meet the listing, I also disagree.[6] As an initial matter, plaintiff's submissions contain no meaningful discussion of the paragraph C requirement of marginal adjustment. *Handau v. Saul*, 2020 WL 4218229, *10 (D. Conn. 2020) ("the plaintiff's brief does not once mention marginal adjustment, despite its presence being necessary for a finding under paragraph C"). In any event, an ALJ is not required to "articulate specific evidence supporting his or her finding that [a claimant's] impairment[] does not medically equal a listed impairment." *See* SSR 17-2p, 2017 WL 3928306 at *4. Rather, "a statement that the [claimant's] impairment[] does not medically equal a listed impairment" will generally constitute sufficient articulation for the ALJ's finding. *Id.* The ALJ's articulation of the reasons for her conclusion that the claimant is not disabled in the remaining steps of the sequential evaluation should "provide [a] rationale that is sufficient for a subsequent reviewer or court to determine the basis" for the step-three medical equivalence conclusion. *Id.*

Although the ALJ's explicit evaluation of the paragraph C requirements of Listing 12.04 was conclusory and merely adopted the language of the listing, review of the decision as a whole demonstrates the basis for the ALJ's determination. As noted by the ALJ, despite plaintiff's mental health symptoms, plaintiff lived alone for significant periods of time and was able to independently perform most activities of daily living. Moreover, the record demonstrates that plaintiff's mental symptoms were well-controlled with medication, his mental health evaluations were largely normal, and Dr. Billings's opinion identified only minimal limitations

---

[6] I also disagree with any contention by plaintiff that remand is warranted because the medical records obtained from CARES contain plaintiff's psychiatric treatment notes but not his weekly counseling session notes (Docket # 15 at 17). *See Martin v. Comm'r of Soc. Sec.*, 2020 WL 611015, *5 (W.D.N.Y. 2020) (citing *Pace v. Comm'r*, 2019 WL 1649501, * 4 (W.D.N.Y. 2019) (ALJ adequately developed the record where it contained "plaintiff's psychiatric records but not mental health counseling notes[;] . . . [t]his [c]ourt finds that there is no gap, despite the noted absence of mental health counseling notes")).

in functioning. On this record, I find that substantial evidence supports the ALJ's conclusion that plaintiff does not meet the paragraph C requirements. *See id.* (collecting cases).

## **CONCLUSION**

After a careful review of the entire record, this Court finds that the Commissioner's denial of DIB was based upon substantial evidence and was not erroneous as a matter of law. Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 16)** is **GRANTED**. Plaintiff's motion for judgment on the pleadings **(Docket # 15)** is **DENIED**, and plaintiff's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

                                                                       *s/Marian W. Payson*
                                                                       MARIAN W. PAYSON
                                                                United States Magistrate Judge

Dated: Rochester, New York
        March 11, 2022